# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-1558V

| | |
|---|---|
| SARAH D. GESCHWINDNER, | |
| Petitioner, | TO BE PUBLISHED |
| v. | Filed: January 28, 2022 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Damages; Influenza ("Flu") Vaccine; Guillain-Barré syndrome. |
| Respondent. | |

*Matthew J. Plache*, Law Offices of Matthew J. Plache, Wolfeboro, NH, for Petitioner
*Terrence Mangan*, U.S. Department of Justice, Washington, DC, for Respondent

## DECISION ON DAMAGES[1]

On October 19, 2017, Sarah D. Geschwindner ("Petitioner") filed a petition, seeking compensation under the National Vaccine Injury Compensation Program ("the Vaccine Program").[2] Pet., ECF No. 1. Petitioner alleges she suffered from a Table injury of Guillain-Barré syndrome ("GBS") as a result of the influenza ("flu") vaccination she received on October 8, 2014. *See* Pet. at 1, ECF No. 1. For the reasons discussed below, I hereby award Petitioner $94,357.33 for past pain and suffering as well as reimbursement of an outstanding Medicaid lien.

---

[1] This Decision will be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

1

## I. Medical History

Petitioner had a medical history of depression, anxiety, hypothyroidism, and chronic fatigue. Ex. 3 at 2. On October 3, 2014, Petitioner presented to the Concord Hospital Emergency Department with a sore throat and shortness of breath; she was diagnosed with an upper respiratory infection and pharyngitis. Ex. 4 at 1-2.

On October 8, 2014, Petitioner had an appointment with her primary care physician Dr. Rory Richardson for depression and thyroid issues. Ex. 3 at 2-5. She received a flu vaccination during this appointment; Petitioner was 30 years old at the time of vaccination. *Id.* at 2. There were no notes regarding Petitioner's sore throat or shortness of breath at this visit. *See id.* at 2-4.

On October 22, 2014, Petitioner returned to the Concord Hospital Emergency Department complaining of increasing leg weakness over the past several days. Ex. 5 at 7-8. Petitioner described a prickling sensation that traveled down both legs and stated that her legs buckled twice when she stood up the prior day. *Id.* at 7. The sensation was more lateral than medial and was accompanied by increased leg weakness. *Id.* The attending doctor recommended an MRI and noted a concern for Guillain Barré syndrome. *Id.* at 8.

On the same day, Petitioner underwent MRIs and a nerve conduction study ("NCS"). *See generally* Ex. 6; Ex. 15 at 15-18. The NCS revealed an aberration in bilateral fibular nerve F-waves responses, which was nonspecific. Ex. 6 at 6. A lumbar MRI was normal. *Id.* at 7. A thoracic MRI revealed some desiccative change in the mid-thoracic discs with minimal posterior central disc protrusion. *Id.* at 9-10.

On October 25, 2014, Petitioner was discharged with a diagnosis of GBS. Ex. 7 at 1-3. Petitioner was given prednisone during her stay; her leg weakness had improved but her legs remained stiff and achy. *Id.* at 1. Dr. Richardson noted that a vaccine adverse event report ("VAERS") was filed as Petitioner had recently received the flu vaccine. *Id.* Dr. Richardson also informed Petitioner she was not to receive another flu vaccine in the future. *Id.* at 2.

On October 29, 2014, Petitioner visited Dr. Cynthia King to follow-up for GBS. Ex. 9 at 1-3. Petitioner reported her symptoms were improving but indicated that she was experiencing weakness; she could only stand for 15-30 minutes at a time and would subsequently feel exhausted. *Id.* at 1. Petitioner informed Dr. King that she was unable to afford physical therapy and required financial assistance to do so. *Id.*

On November 24, 2014, Petitioner visited Dr. Monica Burke at Concord Hospital Neurology Associates regarding "equivocal or very mild Guillain-Barre with presentation of bilateral leg weakness" and stiffness in her quadriceps. Ex. 15 at 10-14. Dr. Burke prescribed cyclobenzaprine (a muscle relaxer) and recommended a follow-up in 10-12 weeks. *Id.* at 12.

On December 1, 2014, Petitioner visited Dr. Richardson for GBS and depressed mood. Ex. 9 at 4-6. Petitioner's leg weakness was improving but she still could not stand for more than 30 minutes. *Id.* at 4. Petitioner's chronic fatigue remained unchanged. *Id.* Petitioner was prescribed Effexor for her mood. *Id.* at 2.

2

On January 2, 2015, Petitioner returned to Dr. Richardson with some improvement. Ex. 9 at 7-10. Petitioner reported she could stand for an hour but not two, which was required for her job at Sam's Club. *Id.* at 7. Petitioner no longer had walking or balancing issues. *Id.*

Petitioner attended four physical therapy sessions on 1/5/2015, 1/15/2015, 1/20/2015, and 1/29/2015. Ex. 8. She was discharged on February 27, 2015 for failure to return. *Id.* at 12.

On February 16, 2015, Petitioner returned for a follow-up. Ex. 9 at 12-14. Petitioner reported that she had difficulty standing for 30 minutes or more and felt off-balance. *Id.* at 12.

On February 23, 2015, Petitioner returned to Dr. Burke for a follow-up. Ex. 15 at 6-9. Dr. Burke noted "tight and sore quads and anterior tibialis, but no longer tight in iliotibial band as was last visit." *Id.* at 6. Petitioner was not experiencing cramping, spasming, weakness or tripping and was not using cyclobenzaprine much. *Id.* Dr. Burke recommended physical therapy, hydration, and continuation of cyclobenzaprine. *Id.* at 8.

On March 23, 2015, Petitioner visited Dr. Richardson. Ex. 11 at 3-5. Petitioner reported she was able to stand for 30 minutes to an hour before sitting and felt like she was no longer improving with her leg strength. *Id.* at 12. Petitioner's primary concern during this visit was her depressed mood.

Petitioner followed-up on April 21, 2015 with continued weakness in her anterior quadriceps. Ex. 11 at 9-12. Petitioner again was primarily concerned with her mood. *Id.* at 9. Regarding her GBS, Dr. Richardson encouraged her to restart physical therapy and get an EMG. *Id.* at 11. A similar visit occurred on June 1, 2015. *Id.* at 16-19.

On June 8, 2015, Petitioner visited Dr. Burke to follow-up regarding her GBS. Ex. 15 at 1-4. Petitioner underwent a nerve conduction study and EMG on June 3, 2015, which were normal. *Id.* at 5. With respect to these studies, Dr. Burke indicated "nerve conduction/EMG looked great! No further, residual damage to the nerves." *Id.* at 3. Dr. Burke noted it was "unclear as to whether or not she had had just a very mild case of GBS" given the normal results. *Id.* at 1. Dr. Burke directed Petitioner to follow up as needed and to continue taking cyclobenzaprine. *Id.*

Petitioner returned to Dr. Richardson on July 13, 2015 after an EMG, which was normal. Ex. 11 at 20-23. Petitioner was doing exercises but stopped physical therapy because walking was more difficult after these sessions. *Id.* at 20.

She had appointments on September 28 and November 30, 2015 with primary concerns regarding her mood. Ex. 11 at 32-39. Petitioner reported largely the same details regarding her GBS and leg symptoms. *See id.* Dr. Richardson encouraged her to continue exercising in order to increase her quad strength. *Id.* at 33.

On December 24, 2015, Petitioner visited the Concord Hospital Emergency Department for bilateral leg pain. Ex. 12. Petitioner reported she was experiencing worsening leg pain over the past two months. *Id.* at 1. On examination, Petitioner had normal gait, normal reflexes, and normal

3

lower extremity strength. *Id*. at 1-2. She was given Toradol and was discharged in stable condition. *Id.* at 2.

Petitioner had medical appointments from 2016-2017 that did not focus on her GBS, and primarily addressed her ongoing depression and thyroid issues. *See generally* Ex. 13. She was encouraged to continue non-weight bearing exercise.

On July 12, 2018, Petitioner enrolled in physical therapy with the goal of reducing leg pain and weakness through aquatic PT. Ex. 17 at 30-34. Petitioner had PT sessions on 7/12/2018, 7/26/2018, 8/15/2018, and 8/28/2018. *Id.* at 32-34, 39-41; 42-45; 46-49. Petitioner was discharged on September 27, 2018 after attending four sessions but missing eight. *Id.* at 27-28.

On September 24, 2018, Petitioner visited Dartmouth-Hitchcock Medical Center to see Dr. Vijay Renga for a second opinion regarding her ongoing leg weakness. Ex. 16 at 5-11. Petitioner reported she developed GBS after a flu shot in 2014 and has had leg pain that has not gone away. *Id.* at 5. She also reported she could not stand for more than 30 minutes and had not worked since 2014. *Id.* Dr. Renga conducted a neurological exam which revealed diminished bilateral reflexes in the biceps, left knee and ankles, and absent reflex in the right knee. *Id.* at 7. Dr. Renga recorded "give away weakness of lower extremities bilaterally, weakness out of proportion in comparison to ability to walk. Tenderness over the thigh muscles bilaterally. Difficulty standing on tip toes or heels." *Id.* Dr. Renga noted that a recent EMG did not show signs of persisting neuropathy but the neurologic evaluation demonstrated that she had weakness in both lower extremities with predominant distal weakness. *Id.* at 9. Petitioner was able to walk without difficulty but had muscle tenderness and pain bilaterally. *Id.* Dr. Renga also noted there were "functional components to [Petitioner's] weakness at this time." *Id.* Dr. Renga prescribed Lyrica, recommended PT, and a follow-up in two months. *Id.*

On August 3, 2018, Petitioner visited Dr. Burke for chronic leg pain. Ex. 17 at 19-23. Dr. Burke noted Petitioner had an "equivocal diagnosis of GBS in 2014" but testing did not give an unequivocal picture of GBS in 2014. *Id.* at 19. Petitioner reported muscle weakness in bilateral quadriceps, difficulty walking and sitting. *Id.* Dr. Burke recommended a repeat NCS and EMG. *Id.* at 22.

Petitioner continued to have other medical appointments in 2018-2019 that dealt primarily with other conditions unrelated to GBS. Ex. 17 at 1-18.

Despite repeated requests that Petitioner file updated medical records, no records have been filed since July 2019.

## II.     Procedural History

On January 4, 2019, I issued a Ruling on Entitlement followed by a Damages Order. ECF Nos. 21, 22. After that, the parties filed joint status reports updating me on their progress in resolving damages. *See* ECF Nos. 25, 28, 31, 32, 33, 34, 35, 36, 37, 38, 40, 42. Petitioner last submitted medical records and documentation pertaining to damages on July 31, 2019. Exs. 16-

4

23. Respondent then submitted numerous status reports stating he had been unable to confer with Petitioner's counsel, Mr. Matthew Plache. *See* ECF Nos. 27, 39, 41, 43, 44, 45.

On October 23, 2020, I held a status conference with the parties where I expressed my concern to Mr. Plache that no substantive documents had been filed in the case since July of 2019. *See* Scheduling Order dated 10/23/2020; ECF No. 46. Mr. Plache informed me that he was in the process of "identifying documents pertaining to the Medicaid lien" and indicated that he would provide specific updates regarding the issue of the Medicaid lien and outstanding EMGs. *Id.* at 1. I gave the parties until November 23, 2020 to file a joint status report updating me on their progress in resolving damages. *See* Scheduling Order dated 10/23/2020.

On November 23, 2020, Respondent filed a status report stating that Mr. Plache communicated that he had "been unable to complete reviewing the Medicaid lien as he has been out of the office with personal extenuating circumstances" and did not hear back regarding the filing of a joint status report. ECF No. 47. I ordered Petitioner to file her outstanding EMGs by December 23, 2020, and I again gave the parties 30 days to file a joint status report updating me on their progress in resolving damages. *See* Scheduling Order dated 11/23/2020.

On December 22, 2020, Respondent indicated that he had been unable to communicate with counsel for Petitioner and did not have any further information regarding the documents I ordered Petitioner to produce. ECF No 48.

Accordingly, on December 23, 2020, I ordered Petitioner to file a status report by January 22, 2021 regarding her progress in obtaining documents related to her Medicaid lien. *See* non-PDF Scheduling Order dated 12/23/2020. Petitioner did not file these documents or a status report by the deadline. On February 8, 2021, I ordered Petitioner to file her overdue status report immediately. *See* non-PDF Scheduling Order dated 2/8/2021. Mr. Plache did not file a status report.

On February 18, 2021, my chambers attempted to contact Mr. Plache via telephone, with Respondent's counsel on the line, to no avail. My law clerk left a voicemail for Mr. Plache to contact my chambers. *See* Informal Communication Remark dated 2/18/2021. On the same day, I issued an order directing Mr. Plache to consult with co-counsel familiar with the Vaccine Program to assist him with this case and file a status report confirming he has complied with the order by March 22, 2021. *See* Scheduling Order dated 2/18/2021, ECF No. 49. A copy of this order was also sent to Petitioner via email and first-class mail. *See id.* No status report was filed nor was any communication received from Petitioner or her lawyer, by my chambers or by Respondent regarding this order.

After these repeated failed attempts to contact counsel for Petitioner, I directed the parties to file briefs regarding the appropriate damages in this case. In this order, I informed Petitioner that if she "fails to submit a brief, I will make a determination on the appropriate damages award without her input." *See* Scheduling Order dated 4/16/2021; ECF No. 50. These briefs were due on June 15, 2021. *Id.*

The parties filed a joint status report on June 14, 2021. Joint Status Rep. dated 6/14/2021, ECF No. 51. In it, the parties stated that Petitioner was receiving ongoing treatment and agreed that updated medical records were "vital to any assessment of damages in this case by respondent or the Court." *Id.* at 1. This represented Mr. Plache's first communication with counsel for Respondent since November of 2020. *See* ECF Nos. 47, 48. This constituted seven months with no communication from Petitioner and her counsel with Respondent and/or my chambers despite numerous orders. In this joint status report, Petitioner's counsel indicated he had formally requested updated medical records last week and had confirmed receipt of that request. *See* Joint Status Rep. dated 6/14/2021, ECF No. 51. Petitioner's counsel also stated he intended to file Petitioner's recent Social Security determination, related medical records, and a revised Medicaid lien related to Petitioner's GBS treatment. *See id.* Petitioner's counsel stated he had sent a copy of Petitioner's Social Security determination to Respondent's counsel. *See id.*

Based on the representation of the parties, I terminated the deadline for damages briefs and instead gave the parties until July 14, 2021 to file a joint status report on their progress in resolving damages. *See* non-PDF Scheduling Order dated 6/14/2021. I specifically directed Petitioner to file her updated medical records, her Social Security disability determination, and her Medicaid lien documentation by July 14, 2021. *See id.*

On July 14, 2021, Respondent filed a status report stating he "has not heard back from petitioner's counsel regarding the status of petitioner's additional documentation or the filing of a joint status report." Resp't's Status Rep. dated 7/14/2021, ECF No. 52. Respondent requested 30 days to update the Court on the status of damages. *See id*. I granted that request and issued an order requiring the parties to file a joint status report on their progress in resolving damages and for Petitioner to file her updated medical records, Social Security determination, and her Medicaid lien documentation by August 13, 2021. *See* non-PDF Scheduling Order dated 7/14/2021.

On August 13, 2021, Respondent filed a nearly identical status report, stating he had not heard from Petitioner's counsel regarding input for the joint status report or regarding the status of Petitioner's additional documentation. Resp't's Status Rep. dated 8/13/2021, ECF No. 53. Petitioner's counsel did not file Petitioner's Social Security disability determination, which he indicated in the June 14, 2021 status report that he had emailed to Respondent's counsel. Petitioner also never filed updated medical records or a revised Medicaid lien.

On August 13, 2021, I issued an order directing the parties to contact my chambers within seven calendar days to provide their availability for a status conference. *See* non-PDF Scheduling Order dated 8/13/2021. Respondent's counsel, Ms. Lynn Schlie contacted my chambers with her availability and also informed my law clerk that she had not heard from Mr. Plache since the filing of the joint status report from June of 2021. Mr. Plache never contacted my chambers as directed.

On August 16, 2021, I directed Respondent to file Petitioner's Social Security determination, as Mr. Plache had not been responsive. Respondent filed that document on the same day. Ex. A, ECF No. 54.

6

On August 24, 2021, I re-issued an order directing the parties to file briefs on damages. *See* Scheduling Order dated 8/24/2021, ECF No. 55. A copy of this order was emailed to Petitioner and was also sent via regular USPS first class mail.

On August 25, 2021, I additionally directed Respondent to subpoena Petitioner's Medicaid lien documentation because Petitioner's counsel had not complied with any of my orders to provide this information. *See* non-PDF Scheduling Order dated 8/25/2021. Respondent filed a Motion to Subpoena the New Hampshire Department of Health and Human Services on September 20, 2021. ECF No. 58. I granted Respondent's motion to subpoena on September 21, 2021. ECF No. 59.

On October 25, 2021, Respondent filed a damages brief stating that he believes that $92,500.00 is an appropriate award of past pain and suffering in this case. Resp't's Brief, ECF No. 61. In his brief, Respondent noted that although Petitioner indicated an intent to make a general claim for past and future lost wages, Petitioner submitted insufficient information to substantiate any such award. Resp't's Brief at 15-16. He stated that "[t]he cause and timing of petitioner's income loss is entirely unknown to respondent and the Court." *Id.* at 16. No damages brief has been filed by Petitioner despite my repeated orders to do so.

On November 29, 2021, Respondent filed Petitioner's New Hampshire Medicaid lien letter. Ex. B, ECF No. 64. On November 30, 2021, I issued an order directing Petitioner to file a brief addressing Respondent's damages brief and Petitioner's Medicaid lien by December 20, 2021. *See* non-PDF Scheduling Order dated 11/30/2021. Petitioner did not file a brief.

On December 9, 2021, Respondent filed an addendum to his damages brief regarding Petitioner's Medicaid lien. ECF No. 65. The Medicaid lien letter (Ex. B) revealed that Ms. Geschwindner had an outstanding lien of $1,857.33 for her GBS-related medical expenses; therefore Respondent proposed that Petitioner be awarded that amount to satisfy the State of New Hampshire Medicaid lien in addition to an award of $92,500.00 for past pain and suffering. *See id.*

Because of Petitioner's counsel's lack of communication, on December 21, 2021, I issued an order to show cause as to why I should not award the amount of compensation proposed by Respondent. ECF No. 66. I gave Petitioner until January 20, 2022, to file a brief regarding damages. A copy of this order was emailed to Petitioner and was also sent via regular USPS first class mail. That date has passed with no filings or communication from Petitioner or her counsel.

Vaccine Rule 3(b)(2) requires that I afford each party a full and fair opportunity to present its case. I have given Petitioner ample opportunity to fully develop the record. The case is therefore ripe for resolution on the record as it currently exists.

### III. Legal Standard

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), originally issued Apr. 19, 2013 ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula.");

7

*Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("The assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D.*, 2013 WL 2448125, at *9; *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125, at *9-11, *citing McAllister*, 1993 WL 777030, at *3. In evaluating these factors, I have reviewed the entire record, including medical records, documentary evidence, and the affidavit submitted by Petitioner.

## IV.   Analysis

In his brief, Respondent summarized Petitioner's clinical course as follows:

> Taking into consideration petitioner's limited hospital stay (three days), conservative treatment (oral prednisone), two very brief courses of PT (for a total of eight sessions), normal EMGs from June 2015 onward, inconsistent treatment with nerve medications, and treating physician statements casting doubt on whether her current symptoms are due to her GBS, petitioner's clinical course is indisputably much less severe than those in previous flu/GBS cases where damages were decided by the Court.

Resp't's Brief at 13. Respondent valued past pain and suffering in this case at $92,500. I agree with Respondent's assessment. While Petitioner clearly suffered from GBS and its sequelae, her clinical course was not as severe as many other GBS cases in the program. For example, in *Dillenbeck v. Sec'y of Health & Hum. Services*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), remanded on other grounds, Petitioner, Gayle Dillenbeck received $170,000.00 in pain and suffering after her diagnosis of GBS following a flu vaccination. *Id.* at 14. Ms. Dillenbeck was hospitalized for two weeks and had multiple rounds of IVIG therapy. *Id.* at 3. After leaving the hospital, Ms. Dillenbeck required live-in care from three family members who helped care for her animals and completed household tasks. *Id.* at 3. Ms. Dillenbeck experienced significant pain, and had to take eight Gabapentin pills per day due to pain. *Id.* She attended outpatient PT two to three times per week. *Id.* Ms. Dillenbeck had numerous falls even while using her walker. *Id.* Ms. Dillenbeck continued to experience lack of sensation in extremities, weakness in her hands, increased sensitivity on her chest, abdomen, and back, and generalized fatigue two and a half years post-hospitalization.

In arriving at my determination in the present case, I have considered Petitioner's limited hospital stay, the fact that she attended a total of eight PT sessions, her treatment with oral prednisone, the statements from Dr. Renga noting give away weakness with functional

components, and the statements from Dr. Burke assessing her GBS as "very mild." Ex. 15 at 10. I have also considered Petitioner's clinical course. Four months after vaccination, Petitioner complained of tightness and soreness in her quadriceps and anterior tibialis. Repeat EMG studies performed in June 2015 were normal. Petitioner experienced depression and chronic fatigue before the flu shot. Although she did complain of leg pain more than two years after vaccination, Petitioner has not presented recent medical record evidence that would allow me to assess her current condition or that would rebut Respondent's position, stated above. In considering all of this information, I find that $92,500 is appropriate to compensate Petitioner for her pain and suffering.

Although Petitioner submitted her tax returns from 2011-2016, this information, standing alone, is not sufficient for me to make a determination regarding lost wages. Petitioner has not submitted any information regarding future pain and suffering, future care, or out of pocket expenses.

Petitioner is entitled to compensation, and she should not continue to wait for the resolution of a relatively straightforward case. I have assessed her damages based on the evidence available in the current record.

## V.     Conclusion

Therefore, based on the record as a whole, I find the Petitioner is entitled to an award as ordered below:

A lump sum of $1,857.33, which amount represents reimbursement of an outstanding Medicaid lien, in the form of a check payable jointly to Petitioner and The Rawlings Company. Petitioner shall endorse this check to The Rawlings Company and then shall mail the endorsed check to the following address:

The Rawlings Company
ATTN: Becky S. McDonald
Reference No.: 117118492
P.O. Box 2000
La Grange, KY 40031-2000

And a lump sum in the amount of $92,500.00, which represents an award of pain and suffering, in the form of a check payable to Petitioner.

This award represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

I approve a Vaccine Program award in the requested amount set forth above. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment herewith.[3]

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master

---

[3] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by jointly filing notice renouncing their right to seek review.